Montclair, Inc. v. Commissioner.
Montclair, Inc. v. Commissioner
Docket No. 85277.
United States Tax Court
T.C. Memo 1962-10; 1962 Tax Ct. Memo LEXIS 297; 21 T.C.M. (CCH) 39; T.C.M. (RIA) 62010; January 23, 1962
James R. Harper, Esq., for the petitioner. Robert B. Milsten, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in income tax of petitioner: Calendar Year
Deficiency
1955
$4,010.14
1956
4,325.81
1957
4,067.99 The only issue presented in this proceeding is whether petitioner is entitled to certain claimed interest deductions. Petitioner is a Georgia corporation organized in 1944. It filed its corporation income tax returns on the cash basis from its inception through the close of the period involved herein with the district director of internal revenue at Atlanta, Georgia. Petitioner constructed a 50-unit garden type apartment project which it owns and rents. From its inception and *298 until the present time the corporation has had three classes of capital stock issued and outstanding in amounts as shown below, and no others: No. of
Class of Stock
Shares
Preferred Class A
100
Preferred Class B
100
Common
10
The common stock of the petitioner, par value $100 a share, was originally issued to the following stockholders in the following amounts: M. F. Brice
3 shares
Margaret T. Brice
2 shares
Dewey Scarboro
3 shares
Grace J. Scarboro
2 shares
Total
10 shares
One hundred shares of preferred, class A, capital stock of petitioner with a par value of $1 per share were issued to the Federal Housing Administration on October 19, 1944. Petitioner's preferred, class B stock was originally issued, 50 shares each, to Margaret T. Brice and Grace J. Scarboro. On August 1, 1946, Grace J. Scarboro transferred her 2 shares of common stock and 50 shares of class B preferred stock of petitioner to M. F. Brice. On the same date Dewey D. Scarboro transferred his 3 shares of common stock of petitioner to M. F. Brice. On January 1, 1947, M. F. Brice endorsed his 3 shares of common stock of petitioner in blank, and either on that *299 same date or on July 1, 1947, Margaret T. Brice transferred her 2 shares of common and 50 shares of class B preferred stock of petitioner to M. F. Brice. [1]
On January 1, 1947, petitioner issued its stock certificates to Tanner H. Brice, son of M. F. Brice, for 5 shares of common and 50 shares each of class A and class B preferred stock. On the same date or on July 1, 1947, certificates for identical amounts of the respective classes of stock were issued by petitioner to Margaret B. Ladson, daughter of M. F. Brice. [2] The certificates with the stubs attached were always in the vault of the Brice Banking Co. [3] All of the stubs were attached to their various certificates with scotch tape at the time they were taken out of the records. *
*300 As of May 1, 1948, M. F. Brice made a financial statement to the First National Bank of Atlanta on which he stated that he owned 100 percent of the stock of Montclair, Inc. The Federal Housing Administration transferred its 100 shares of class A preferred stock of petitioner to it for cancellation on May 19, 1947. In 1944, petitioner began construction of the apartments, which construction was financed by loans from the Brice Banking Co. in the amount of $323,900. On November 1, 1944, petitioner executed a security deed in favor of the Brice Banking Co. in the above amount, which deed was recorded the next day. The Federal Housing Administration insured this mortgage, receiving the entire 100 shares of class A preferred stock of petitioner. A policy of title insurance on the property in the amount of $323,900 was issued to "Brice Banking Company and/or Federal Housing Commissioner" on November 1, 1944. By late 1945 and 1946 the loan to petitioner was very large relative to the assets of the Brice Banking Co., and since M. F. Brice was the principal stockholder of both lender and borrower, the Federal Deposit Insurance Corporation objected to the size of this loan and asked *301 that it be moved out of that bank. M. F. Brice thereupon achieved that directive by borrowing funds personally and repaying the loan, and the security deed was entered satisfied on July 2, 1946. The Federal Housing Administration insurance had terminated on June 1, 1946. On January 28, 1946, M. F. Brice attempted to borrow $323,900 from the C & S Bank of Savannah, Georgia, offering a mortgage on petitioner's apartments. The loan was declined because that bank was not interested in loans upon long-term real estate transactions. On July 1, 1946, the C & S Bank loaned M. F. Brice $170,000 secured by United States Treasury bonds having a face value of $170,000. On June 27, 1946, petitioner borrowed $150,000 from the First National Bank of Atlanta, which was accompanied by a deed to secure debt with the apartment project collateral in the same amount. This debt was paid off on November 1, 1946. On June 4, 1947, this bank loaned petitioner an additional $12,120. In addition to the pledge of the real estate as collateral, M. F. Brice endorsed the note for $12,120. Thereafter various short-term loans were made by said First National Bank to petitioner, all notes being endorsed by M. F. *302 Brice and many being secured by the apartment project. A new deed to secure debt was given First National in September 1948 for $50,000. The account was closed out fully paid on January 31, 1949, and the deed to secure debt executed at the date of the first loan was acknowledged to have been satisfied on February 21, 1949, and was so entered in the record May 6, 1949. On April 30, 1949, petitioner borrowed $125,000 from Coastal States Life Insurance Company, pledging the apartment project as collateral. This debt was paid on or before April 17, 1950. On December 27, 1950, Coastal States loaned $94,520 to petitioner. The unpaid balance on this loan on December 31, 1954, was $44,523.50; on December 31, 1955, $16,430.41; and on December 31, 1956, $1,000. The balance was due December 31, 1957, but had not been paid at the time of the trial. The following data were reported by petitioner on its income tax returns: Long-Term
Montclair, Inc.
Notes Pay-
Tax Return
able at
Due to Officers
for the
End of
at End of
Total Capi-
Period:
Year
Year
tal Stock
Not Disclosed
10/1/44-7/31/45
$203,000.00
on Return
$11,000.00
Not Disclosed
8/1/45-7/31/46
323,900.00
on Return
11,000.00
Not Disclosed
7/1/46-6/30/47
315,802.50 *
on Return
11,000.00 *
Not Disclosed
8/1/47-7/31/48
303,624.51
on Return
11,000.00
Not Disclosed
7/1/48-6/30/49
293,902.07
on Return
11,000.00
Not Disclosed
7/1/49-6/30/50
293,902.07
on Return
11,000.00
1951
Not Disclosed
Not Disclosed
Not Disclosed
on Return
on Return
on Return
1952
Not Disclosed
Not Disclosed
Not Disclosed
on Return
on Return
on Return
1953
Not Disclosed
Not Disclosed
Not Disclosed
on Return
on Return
on Return
1954 (Notes Pay-
able)
44,523.50
$222,785.34 **
11,000.00
1955 (Notes Pay-
able)
16,431.41
238,872.41
11,000.00
1956 (Notes Pay-
able)
16,431.51
224,987.62
11,000.00
1957 (Notes Pay-
able)
1,000.00
225,248.24
11,000.00
*303 Montclair, Inc.
Tax Return
Total Interest De-
for the
Notes Receiv-
ductions Claimed
Period:
able -
on Returns
Officers
10/1/44-7/31/45
$213,595.21
8/1/45-7/31/46
11,000.00
7/1/46-6/30/47
11,000.00 *
$ 6,180.45
8/1/47-7/31/48
11,000.00
17,413.82
7/1/48-6/30/49
11,000.00
12,048.87
7/1/49-6/30/50
11,000.00
8,834.21
1951
Not Disclosed
coastal
on Return
States
3,780.80
Uniden-
tified
15,912.33
1952
Not Disclosed
on Return
3,509.38
1953
Not Disclosed
on Return
2,427.12
1954 (Notes Pay-
able)
11,000.00
14,534.22
1955 (Notes Pay-
able)
11,000.00
14,998.23
1956 (Notes Pay-
able)
11,000.00
14,695.34
1957 (Notes Pay-
able)
11,000.00
13,593.67
Petitioner deducted interest payments to M. F. Brice in 1955, 1956, and 1957 based upon 6 percent *304 of the balance in the "Due Officers" account at the beginning of each year. Respondent disallowed these deductions of $13,367.12, $14,332.34, and $13,499.26, respectively. These amounts were reported as interest income in the respective years by M. F. Brice. During the years in issue petitioner paid M. F. Brice $20,229, $30,557.09, and $32,378. The payments were made by check, usually payable to the current Brice Banking Co. although some were made payable to other payees for the benefit of M. F. Brice. Petitioner has never paid a formal dividend to its shareholders. Petitioner has claimed no deductions for compensation to its officers. M. F. Brice was petitioner's president at all times herein relevant and controlled petitioner's affairs completely. Petitioner reported taxable income of $1,351.97 in 1955, $3,440.56 in 1956, and $4,897.99 in 1957. Respondent seeks to add another page in the seemingly limitless volume of cases denying interest deductions [4] to corporations because the payments are not truly "interest." Interest necessarily implies an indebtedness, which latter term was concisely defined in (C.A. 2, *305 1957): The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, , too great a variation will of course preclude such treatment. ; . In the instant case, we are not persuaded that petitioner's claimed indebtedness to M. F. Brice ever existed. His son, Tanner H. Brice, testified that there was a "mental agreement" to pay, but even assuming this to be true, we cannot conclude that the payments here in issue were interest. Many considerations bear weight in determining whether an advance is debt or risk investment. , *306 affirming and . The more significant factors were listed in (C.A. 9, 1960), affirming a Memorandum Opinion of this Court: There are at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. Using these criteria collectively we are convinced that petitioner has failed to establish a bona fide indebtedness to M. F. Brice. The absence of any promissory *307 note or formal evidence of indebtedness is not necessarily fatal. However, no fixed date of maturity or rate of interest existed. See , affd. per curiam (C.A. 3, 1948). Also the payments were dependent on and consisted of petitioner's profits after current expenses. Tanner H. Brice testified as follows: Q. What happened to the current funds - in running through the balance sheets, which are stipulated as a part of the tax returns, I don't find any cash in the balance sheets attached to the tax return. Why is that? A. Well, all of the income from Montclair went directly to dad, over and above any operating expenses, and if there was any balance in the account at the end of the year, why, it was drawn out and paid to him. Q. Why was that? A. We were endeavoring to retire this debt as rapidly as we possibly could. Q. You have testified that you had no formal plan of debt management. A. No; we had no definite plan in mind. * * *
Q. * * * You indicated before that this debt arose between 1944 and 1946; approximately those years; *308 is that right, sir? A. Approximately; yes. * * * Q. What was the liability to pay interest at that time? A. What was the interest rate at that time? Q. I asked you how much were you obligated to pay your father at that time, sir? A. No set amount. * * *
Q. You don't know the purpose of the checks, though, do you, sir? A. Well, all of the income from Montclair went to my father; over and above all of the operating expenses. We conclude that payments to M. F. Brice were placed at the risk of petitioner's business. See , affd. per curiam (C.A. 9, 1950). We observe that petitioner contends that it owed $199,667.63 (the amount shown in its tax return as due officers) other than to Coastal States as of December 31, 1954. The next day, per its 1955 income tax return, this figure was $222,785.34. It is petitioner's position that 6 percent of the latter figure, or $13,367.12, was paid to M. F. Brice as interest, and $6,861.88 as principal. Yet at the close of 1955 the unpaid principal had risen to $238,872.41, although the testimony is clear that no advances were made during or immediately before *309 the taxable years at issue. In 1956, $30,557.09 was paid, of which $16,224.75 would be principal after deducting the claimed interest. However, the amount due officers decreased by slightly less than $14,000. In 1957, $32,378 was paid of which only $13,499.26 was claimed to be interest, yet during that year the unpaid principal balance again actually increased. We are unable to reconcile these figures with a theory of payment of interest and principal on a fixed indebtedness. Petitioner argues that M. F. Brice made a valid gift of all of its stock to his children on January 1, 1947, and that therefore the payments could not be disguised dividends during the taxable years in issue because Brice owned no stock during those years. We do not believe that petitioner has sustained its burden of proving the alleged 1947 gifts of its stock to the children of M. F. Brice, but we need not decide that question because we have found no bona fide indebtedness within the purview of section 163. The facts that M. F. Brice received all of the net profits of petitioner, that the claimed interest rate was variable, and that the claimed advances to petitioner were made prior to the date of the alleged *310 gifts, all make it clear that M. F. Brice put his capital into petitioner expecting to profit only to the extent of its future net earnings. To summarize: There was no formal evidence of indebtedness, no fixed maturity date, claimed "repayments and interest" came solely from net earnings, there was no right to enforce payment of interest or principal if opposed, M. F. Brice effectively managed petitioner at all relevant times, and payments to him were subordinated to regular corporate creditors. It is our view, from the entire record, that the claimed interest deductions must be disallowed. Decision will be entered for the respondent. Footnotes
1. Her endorsements on the backs of these certificates were apparently dated 7/1/1947 and then the word "Jan." written over the figure 7.↩
2. The daughter's certificates are dated January 1, 1947, but the stubs are dated "7/1/1947." ↩
3. Brice Banking Co. was originally a charter bank in which M. F. Brice owned 350 shares out of a total of 500 shares outstanding. The bank name was changed in 1947 to Vidalia Banking Co. when M. F. Brice sold his interest. In 1949 he opened another private bank known as Brice Banking Co., which operated as a partnership composed of himself and his son, Tanner H. Brice. This bank has continued to operate as a private bank until the present time. ↩
*. The words "except that the stub on the common stock certificate of Margaret B. Ladson was in its original condition" were deleted by an official order of the Tax Court dated February 8, 1962 and signed by Judge Forrester.↩
*. Balance sheet figures not disclosed on return for year ended 6-30-47 but were taken from beginning figures on return for the next year. ↩
**. So stipulated. The actual return filed for the calendar year 1954 showed $199,667.63 in the "Due Officers" account. (The 1955 return shows the stipulated figure in the opening balance.)↩
4. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩